UNITED STATES, Appellant

v.

MARCELLE E. FERGUSON, Private E–1, DOUGLAS PETANOVICH, Private E–2, DONALD R. VIBBERT, Private E–1, and GEORGE J. MICHAELS, Private E–2, U. S. Army, Appellees

5 USCMA 68, 17 CMR 68

No. 3289

Decided October 22, 1954

Lᴛ Cᴏʟ William R. Ward, U. S. Army, and 1sᴛ Lᴛ Kenneth A. Howard, U. S. Army, for Appellant.

Lᴛ Cᴏʟ George M. Thorpe, U. S. Army, for Appellees.

## Opinion

Gᴇᴏʀɢᴇ W. Lᴀᴛɪᴍᴇʀ, Judge:

In view of the principles announced by the Chief Judge and Judge Brosman in their separate opinions, the views expressed by the author judge do not fix the law of the case. The separate opinions will disclose the principles upon which there is agreement and only in those areas is the law settled. Because the majority of the Court is of the opinion that a rehearing should be granted, it is so ordered.

In publishing my views I find no good purpose could be served by recasting my opinion to meet the arguments advanced by my associates. The principles I chose to follow were, and remain, influenced by my view that rules of procedure and concepts should not be tortured and twisted to meet individual cases. Either boards of review and this Court should be guided by rules which should be observed, or the system becomes one of men and not one of

laws. If that happens, 'the record on appeal becomes as variant as the idiosyncrasies of the individual judges.

Because of the nature of the issues with which we are concerned in this case, a detailed statement of the facts supporting the convictions is unnecessary. Suffice it to say that the four accused, together with another soldier, were tried by a general court-martial at Camp Atterbury, Indiana, for mutiny in violation of Article 94, Uniform Code of Military Justice, 50 USC § 688. The court-martial sentenced each to a dishonorable discharge, total forfeitures, and confinement at hard labor as follows: Private Ferguson—30 years, Private Michaels—35 years, Private Petanovich—15 years, and Private Vibbert—10 years. The convening authority approved the findings and sentences; but with respect to the periods of confinement he approved the 10 years adjudged against Vibbert and reduced the terms of Ferguson and Michaels to 20 years, and that of Petanovich to 10 years. The case was then forwarded to the board of review.

While the matter was pending before the board of review, the staff judge advocate of Camp Atterbury forwarded to The Judge Advocate General of. the Army a transcript of statements made at a conference held with the court-martial members the day before trial commenced. The Judge Advocate General referred the document to appellate defense counsel and the latter submitted a supplemental assignment of errors to the board of review for consideration. The board of review concluded that it had the right to review matters outside the record where they pertained to jurisdiction; that the pretrial conference reflected command control over the court-martial members; that the exercise of such control rendered the members of the court-martial incompetent to hear and decide the case; and that the court-martial was, therefore, without jurisdiction to proceed. Accordingly, the board held the proceedings null and void and ordered that the convening authority might direct a new trial before another court-martial.

On July 8, 1953, The Judge Advocate General of the Army further reduced the periods of confinement as follows: Private Ferguson from 20 years to 5 years; Private Michaels from 20 years to 4 years; and Privates Petanovich and Vibbert from 10 years to 2 years. On the same date he certified the case to this Court, requesting that we determine the following issues of law: (1) whether the board of review had the right to consider the transcript of the pretrial conference; (2) if so, did the remarks of the staff judge advocate contravene any provision of the law; (3) if so, was the error jurisdictional, rendering the findings and sentences void; and (4) if error was committed, could the board have cured any possible prejudice to the substantial rights of the accused by appropriate reduction of the sentence? Because of the status of the record as it now stands we shall vary, slightly, the order in which the certified questions will be discussed.

I

The first question necessarily to be decided is whether the board of review could consider the transcript of the pretrial conference. The Chief Judge and Judge Brosman do not concur with the concepts announced in this section of the opinion and·so the views announced are only those of the author judge. The general rule in appellate criminal practice is that an appellate tribunal passes merely upon the errors allegedly made in the lower court. That rule prohibits a trial de novo in the appellate body or the interjection of new issues after the trial phase has been completed and it prevents the use of evidence not considered in the original hearing. See Rumely v. United States, 197 F2d 166, 176 (CA DC Cir), aff'd 345 US 41, 97 L ed 770, 73 S Ct 543. In most jurisdictions the specific errors complained of must be set out and the appeal is limited to those asserted. Usually the appellate court is limited to questions of law, but Congress in setting up the military appellate procedure gave to boards of review the right to review and weigh the facts. Moreover, Congress granted an automatic appeal to those boards, but in spite of the liberalized grants, the Uniform

Code of Military Justice makes clear that boards of review are intended to be appellate tribunals and not trial forums. Such being the case, the principles, except as modified by the Code or the Manual, applicable to appellate courts should be enforced.

With the possible exception of insanity, neither the Code nor the Manual makes any specific provision for boards of review to consider matters outside the record of trial. On the contrary, Article 66, Uniform Code of Military Justice, 50 USC § 653, provides that boards of review shall act "on the basis of the entire record," and we have held that boards may not go beyond the trial record to obtain evidence to support the findings. United States v. Simmons, 2 USCMA 105, 6 CMR 105; United States v. Gordon, 2 USCMA 632, 10 CMR 130; and United States v. Whitman, 3 USCMA 179, 11 CMR 179. However, because of Manual language, the Court has recognized that in instances where insanity is in issue, the interests of justice require that extraneous matters be given attention. See United States v. Burns, 2 USCMA 400, 9 CMR 30; United States v. Niolu, 2 USCMA 513, 10 CMR 11; and United States v. Trede, 2 USCMA 581, 10 CMR 79. We have, however, gone no further.

Article 66 (f), Uniform Code of Military Justice, supra, provides:

"The Judge Advocates General of the armed forces shall prescribe uniform rules of procedure for proceedings in and before boards of review and shall meet periodically to formulate policies and procedure in regard to review of court-martial cases in the offices of the Judge Advocates General and by the boards of review."

The Judge Advocates General of the services have concluded that, even though dehors the record, evidence touching on certain issues must be considered by boards of review if the latter are to reach fair and just results. Recognition of this principle is evidenced by the inclusion of Rule IXF in the Uniform Rules of Procedure for Pro-

ceedings In and Before Boards of Review (DA Bulletin No. 9, dated June 8, 1951). It provides as follows:

"F. *Matters outside record.*—Matters outside the record of trial will not be presented to or argued before a board of review except with respect to:
1. A petition for new trial referred to a board under Article 73,
2. A question of jurisdiction,
3. Matters affecting the sanity of an accused tending to show that further inquiry as to his mental condition is warranted in the interest of justice,
4. Matters as to which judicial notice may be taken in military law.

When requested by the Judge Advocate General, a board of review may hear and report to him on, any matter outside the record in mitigation of the sentence, or otherwise in the interest of justice."

A cursory reading of the rule reveals that neither subsections 1, 3, nor 4 renders the transcript of these proceedings competent. No petition for a new trial was filed, no issue of insanity was involved, and there is nothing of which judicial notice might properly be taken. In addition, application of the final paragraph is inappropriate as there is no showing that The Judge Advocate General of the Army requested the board to report to him on any matter. I cannot, without doing violence to the English language, hold that his passing of a document to defense counsel constitutes a request that the board of review make a recommendation to him. Even if I could that would not authorize the board of review to commingle his request with the record on appeal. The purposes of that section are to permit The Judge Advocate General to form an opinion for recommending administrative or clemency action.

Appellate defense counsel, supporting the position taken by the board of review, contend that consideration of the pretrial conference transcript was authorized because it controlled the issue of jurisdiction. Government counsel concede that the board was authorized to consider it for that limited

purpose, but for no other determination. I will develop the latter contention under my discussion of the next certified question. At the moment and for the purpose of disposing of the first certified question only, it is sufficient to state that, based on the concession made and the rules previously quoted, the board of review was authorized to consider the transcript to determine the jurisdictional question.

## II

In disposing of the second question involving jurisdiction, I assume, what I later discuss, that command control was improperly exercised in this case. The Manual for Courts-Martial, United States, 1951, paragraph 8, page 14, has this to say about jurisdiction:

"The jurisdiction of a court-martial—its power to try and determine a case—and hence the validity of each of its judgments, is conditioned upon these indispensable requisites: That the court was appointed by an official empowered to appoint it; that the membership of the court was in accordance with the law with respect to number and competency to sit on the court; and that the court was invested by act of Congress with power to try the person and the offense charged."

Paragraph 4, Manual for Courts-Martial, supra, which paraphrases Article 25 of the Uniform Code of Military Justice, 50 USC § 589, sets out the test for competency. It provides:

"*Who may serve as members.*— Any officer on active duty with the armed forces shall be eligible to serve on courts-martial (Art. 25*a*). Any warrant officer on active duty with the armed forces shall be eligible to serve on general and special courts-martial for the trial of any person other than an officer (Art. 25*b*). Any enlisted person on active duty with the armed forces shall be eligible to serve on general and special courts-martial for the trial of any enlisted accused who has personally requested in writing, prior to the convening of the court (61*i*), that enlisted persons serve on it (Art. 25*c*)."

If I were to consider only the Manual provisions, my task would be less difficult; but I have been referred to decisions of the Federal courts which seemingly extend jurisdiction beyond the scope of those provisions. The extension has been gradual and at times doubtful. I, therefore, seek to search the area for its boundaries. It is well settled that judgments of courts-martial are not subject to direct review by civilian courts (Dynes v. Hoover, 61 US 65, 20 How 65, 15 L ed 838 (1857); Shaw v. United States, 209 F2d 811 (CA DC Cir); and traditionally the rule has been that they may only be attacked collaterally where it is apparent they have proceeded without jurisdiction (See Snedeker, Habeas Corpus, 6 Vanderbilt L Rev 288, 295 (1953) Note 71; also 15 ALR2d 387, and cases cited therein). However, the cases show that in order to reach a denial of the due process of law guaranteed by the Fifth Amendment, the delineation between aggravated errors improperly influencing a finding of guilt and those ousting the court-martial of jurisdiction to hear and determine the cause has become indistinct. Pretermitting illegal sentences, the earlier opinions held that lack of jurisdiction of courts-martial, which could be reached by civilian courts through habeas corpus writs, must be determined by a finding that one of the following requisites was missing: (1) that the court-martial was properly constituted, (2) that it had jurisdiction of the subject matter, and (3) that it acquired jurisdiction over the person of the accused. That view was early announced by the Supreme Court in Ex parte Parks, 93 US 18, 23 L ed 787; Ex parte Siebold, 100 US 371, 25 L ed 717 (1879); and Ex parte Reed, 100 US 13, 25 L ed 538. Gradually, however, that court broadened the base and, through the process' of habeas corpus writs, reached out in civilian and military cases to consider issues involving a denial of constitutional rights which normally would be treated as non-jurisdictional error. A leading nonmilitary case evidencing that trend is Johnson v. Zerbst, 304 US 458, 82 L ed 1461, 58 S Ct 1019 (1938). There the district court had refused to

**73**

grant a writ of habeas corpus based upon a contention that the petitioner had been denied his right to counsel under the Sixth Amendment. The lower court held that a violation of that Amendment was not sufficient to support a holding that the trial was void; and that the error could not be reached in a habeas corpus proceeding as, at most, it constituted a trial error or irregularity which could only be corrected on appeal. Bridwell v. Aderhold, 13 F Supp 253. The Supreme Court reversed, stating:

"Since the Sixth Amendment constitutionally entitles one charged with crime to the assistance of Counsel, compliance with this constitutional mandate is an essential jurisdictional prerequisite to a Federal court's authority to deprive an accused of his life or liberty. When this right is properly waived, the assistance of Counsel is no longer a necessary element of the court's jurisdiction to proceed to conviction and sentence. If the accused, however, is not represented by Counsel and has not competently and intelligently waived his constitutional right, the Sixth Amendment stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty. A court's jurisdiction at the beginning of trial may be lost 'in the course of the proceedings' due to failure to complete the court—as the Sixth Amendment requires—by providing Counsel for an accused who is unable to obtain Counsel, who has not intelligently waived this constitutional guaranty, and whose life or liberty is at stake. If this requirement of the Sixth Amendment is not complied with, the court no longer has jurisdiction to proceed. The judgment of conviction pronounced by a court without jurisdiction is void, and one imprisoned thereunder may obtain release by *habeas corpus*." [Johnson v. Zerbst, 304 US 458, 82 L ed 1461, 58 S Ct 1019.]

Military cases which have been the subject of petitions for writs of habeas corpus in the Federal civilian courts obscure the line of departure between errors which rise to the dignity of jurisdictional infirmities and those which do not. In Schita v. King, 133 F2d 283 (CA8th Cir 1943), cert den Schita v. Pescor, 322 US 761, 64 S Ct 1273, 88 L ed 1589, the petitioner had been convicted of murder by a general court-martial. He brought a petition for a writ of habeas corpus alleging ten irregularities committed at his trial. The alleged irregularities consisted of denial of military counsel of his own choice, denial of the right to call witnesses, intimidation of witnesses, and acceptance of evidence given by unsworn witnesses. The respondent failed to challenge the claimed abuses. The lower court held that assuming the facts to be as represented by the petitioner, he was not entitled to be released. The United States Circuit Court of Appeals, Eighth Circuit, reversed and stated:

". . . As the record stands, it appears that the allegations contained in petitioner's amended petition relative to the proceedings resulting in his conviction, though taxing credulity, stood without dispute. There was no evidence received at the hearing tending to dispute these charges but the court was of the view that they were not sufficient to show lack of due process or want of jurisdiction in the court to enter the judgment of conviction. In view of the trend of modern decisions, particularly the decisions of the Supreme Court, we cannot accept this view as sound. Walker v. Johnston, 312 U. S. 275, 61 S. Ct. 574, 85 L. Ed. 830; Chambers v. State of Florida, 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716; Johnson v. Zerbst, 304 U. S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461; Smith v. O'Grady, 312 U. S. 329, 61 S. Ct. 572, 85 L. Ed. 859; Waley v. Johnston, 316 U. S. 101, 62 S. Ct. 964, 86 L. Ed. 1302."

In Hicks v. Hiatt, 64 F Supp 238 (1946), a District Court in Pennsylvania considered a petition for a writ of habeas corpus which alleged the following errors: failure to warn accused before accepting his pretrial statement, improper pretrial investigation, requiring accused to reply to questions which tended to incriminate and degrade him, admission of hearsay testimony, failure

to produce witnesses helpful to accused, incompetent defense counsel, and inadequate review. The writ was granted and no appeal taken.

In Anthony v. Hunter, 71 F Supp 823 (1947), a District Court in Kansas granted a writ because of the following irregularities: The pretrial investigation was inadequate; the reviewing authority failed to set aside findings because of insufficient evidence; the Government failed to secure witnesses favorable to defense; there was a failure to afford the accused an opportunity to prepare for trial; accused was denied counsel of his own choice; and certain members of the court-martial lacked the qualifications required by statute.

In Henry v. Hodges, 76 F Supp 968 (1948), the District Court in New York granted a writ on the grounds of an inadequate pretrial investigation. However, it must be noted the Supreme Court has held otherwise. In Humphrey v. Smith, 336 US 695, 93 L ed 986, 69 S Ct 830 (1949), that court stated:

"We hold that a failure to conduct pre-trial investigations as required by Article 70 does not deprive a general courts-martial [sic] of jurisdiction so as to empower courts in habeas corpus proceedings to invalidate court-martial judgments. It is contended that this interpretation of Article 70 renders it meaningless, practically making it a dead letter. This contention must rest on the premise that the Army will comply with the 70th Article of War only if courts in habeas corpus proceedings can invalidate any court-martial conviction which does not follow an Article 70 pre-trial procedure. We cannot assume that judicial coercion is essential to compel the Army to obey this Article of War."

In Hiatt v. Brown, 175 F2d 273 (1949), the Court of Appeals, Fifth Circuit, affirmed a lower court judgment granting a writ of habeas corpus. There it was alleged, among other claimed irregularities, that the law member was not qualified as required by the Articles of War. The Court stated:

"The arbitrary action of organizing this court-martial in complete disregard of the plain requirements of the 8th Article of War is manifestly reviewable, both as an abuse of discretion, and as a fatal organizational defect which effectually divests the court-martial of jurisdiction. Cf. Henry v. Hodges, 2 Cir., 171 F. 2d 401. To hold otherwise would violate both the spirit and mandate of the Congressional enactment. Manifestly, this is true where the accused, as here, is being tried in time of peace for the offense of murder."

Furthermore, the court found the record to be replete with prejudicial errors and irregularities such as insufficient evidence, no pretrial investigation, and incompetent counsel. As to these errors the court said:

"While each of the above errors and irregularities may not constitute a jurisdictional defect in itself, still when we consider the cumulative effect of the highly prejudicial errors present, we are led unerringly to the conclusion that this petitioner has not been accorded a fair trial, even under military law. Hicks v. Hiatt, D. C., 64 F. Supp. 238. We have merely adverted to certain phases of the evidence, not for the purpose of reviewing its sufficiency to support the conviction, but only to show that but for the errors complained of, petitioner might have had some measure of due process. Although we realize that it is no longer our province to review the evidence in a court-martial proceeding we believe it still essential that an accused before a military tribunal be accorded at least some semblance of a fair trial. Otherwise, the constitutional guaranty of due process of law under the Fifth Amendment, as applied to habeas corpus applications from court-martial convictions, no longer obtains in the federal courts. In the absence of a plain pronouncement to that effect from our Court of Last Report, it is not our province to so declare the law. Cf. Wade v. Hunter, 336 U. S. 684, 93 L ed 974, 69 S. Ct. 834."

The Supreme Court would not accept

the principles enunciated in the two foregoing quotations and reversed (Hiatt v. Brown, 339 US 103, 94 L ed 691, 70 S Ct 495). That Court concluded the decision as to whether a member of The Judge Advocate General's department was available to serve as law member was within the discretion of the convening authority. As to the other alleged errors, the Supreme Court stated:

"The Court of Appeals also concluded that certain errors committed by the military tribunal and reviewing authorities had deprived respondent of due process. We think the court was in error in extending its review, for the purpose of determining compliance with the due process clause, to such matters as the propositions of law set forth in the staff judge advocate's report, the sufficiency of the evidence to sustain respondent's conviction, the adequacy of the pretrial investigation, and the competence of the law member and defense counsel. Cf. Humphrey v. Smith, 1949, 336 U. S. 695, 69 S. Ct. 830. It is well settled that 'by habeas corpus the civil courts exercise no supervisory or correcting power over the proceedings of a court-martial. . . . The single inquiry, the test, is jurisdiction.' Re Grimley, 1890, 137 U. S. 147, 150, 11 S. Ct. 54, 34 L. Ed. 636. In this case the court-martial had jurisdiction of the person accused and the offense charged, and acted within its lawful powers. The correction of any errors it may have committed is for the military authorities which are alone authorized to review its decision. Application of Yamashita, 1946, 327 U. S. 1, 8–9, 66 S. Ct. 340, 344, 345, 90 L. Ed. 499; Swaim v. United States, supra, 165 U. S. at page 562, 17 S. Ct. at page 451, 41 L. Ed. 823."

In United States v. Hiatt, 141 F2d 664 (CA 3d Cir), the accused sought a writ of habeas corpus, contending that the court-martial lost jurisdiction because it heard the trial judge advocate in the absence of the accused and thereby denied him due process of law. The Court denied the writ, stating:

". . . All that the relator alleges took place was that the court-martial gave the trial judge advocate instructions to produce additional evidence at an adjourned session. The relator admits, however, as we have said, that no additional evidence was produced at the later session. Although it may be that this occurrence, if in fact it took place, was in violation of the 30th Article of War, 10 USCA § 1501, and might therefore have afforded grounds for the military reviewing authority to disapprove the findings and sentence of the court-martial under the 47th Article, 10 USCA § 1518, and remanded the case for rehearing under Article 50½, 10 U. S. C. A. § 1522, it could not in our opinion have so seriously affected the fundamental fairness of the trial as to deprive the court under the fifth amendment of its jurisdiction to adjudge and sentence the relator. At most it amounted to a procedural error for which no inquiry in habeas corpus proceedings has ever been available."

The latest pronouncement of the United States Supreme Court can be found in Burns v. Wilson, 346 US 137, 97 L ed 1508, 73 S Ct 1045. To highlight the point now giving me concern, I quote from all opinions:

Judgment of the Court:

"Petitioners' applications, as has been noted, set forth serious charges —allegations which, in their cumulative effect, were sufficient to depict fundamental unfairness in the process whereby their guilt was determined and their death sentences rendered. Had the military courts manifestly refused to consider those claims, the District Court was empowered to review them de novo. For the constitutional guarantee of due process is meaningful enough, and sufficiently adaptable, to protect soldiers—as well as civilians—from the crude injustices of a trial so conducted that it becomes bent on fixing guilt by dispensing with rudimentary fairness rather than finding truth through adherence to those basic guarantees which have long been

recognized and honored by the military courts as well as the civil courts."

Mr. Justice Minton, concurring in the affirmance of the judgment, stated:

"If error is made by the military courts, to which Congress has committed the protection of the rights of military personnel, that error must be corrected in the military hierarchy of courts provided by Congress. We have but one function, namely, to see that the military court has jurisdiction, not whether it has committed error in the exercise of that jurisdiction."

Mr. Justice Frankfurter stated:

"I cannot agree that the only inquiry that is open on an application for habeas corpus challenging a sentence of a military tribunal is whether that tribunal was legally constituted and had jurisdiction, technically speaking, over the person and the crime. Again, I cannot agree that the scope of inquiry is the same as that open to us on review of State convictions; the content of due process in civil trials does not control what is due process in military trials. Nor is the duty of the civil courts upon habeas corpus met simply when it is found that the military sentence has been reviewed by the military hierarchy, although in a debatable situation we should no doubt attach more weight to the conclusions reached on controversial facts by military appellate courts than to those reached by the highest court of a State."

Mr. Justice Douglas, in his dissenting opinion, stated:

"The question whether the military tribunal has exceeded the powers granted it by Congress may be tested by habeas corpus. See Hiatt v. Brown, 339 U. S. 103, 70 S. Ct. 495, 94 L. Ed. 691; Whelchel v. McDonald, 340 U. S. 122, 71 S. Ct. 146, 95 L. Ed. 141; Gusik v. Schilder, 340 U. S. 128, 71 S. Ct. 149, 95 L. Ed. 146. But it is also clear that that review is not limited to questions of 'jurisdiction' in the historic sense."

I have set forth and considered carefully the views of the many Judges and Justices who have considered the military cases in hopes I could find an area of agreement for the breadth and scope of the term "jurisdiction." The Manual language undoubtedly defines the word in its limited historic sense. Certain of the cases seem to give it the same content and meaning while others go much beyond that restricted view. However, I believe that the Supreme Court has, for the Federal civilian system, rejected the narrow definition of the term, and widened the area in which it will consider cases involving infringements on constitutional privileges. For the purpose of this case, I can accept the broadened base because it seems to be used in those instances where the record, as a whole, shows an accumulation of errors of such serious proportion that it can be said an accused was not protected "from the crude injustices of a trial so conducted that it becomes bent on fixing guilt by dispensing with rudimentary fairness rather than finding truth through adherence to those basic guarantees which have long been recognized and honored by the military courts as well as the civil courts." For reasons which will hereinafter appear, any showing closely approximating that state of affairs is not apparent in this instance.

The record establishes that the accused were afforded all of their statutory rights. They were represented at the trial level by two qualified lawyers. No contention is made that defense counsel did not well and truly represent their clients. They were not denied a full and fair opportunity to question members of the court-martial on voir dire to determine their qualifications to sit. They did not exercise that right; they did not challenge anyone for cause; and they did not excuse any member of the court-martial by preemptory challenge. Had they questioned any member of the court, the issue which now concerns us could have been fully exploited at the trial level and reviewed on appeal. Adequate appellate proceedings are available to an accused to correct any error committed at the trial

**77**

level. The convening authority may return the record for corrective purposes; he may take action to cure any error, reduce the sentence if it is not appropriate, or order a rehearing. A board of review may take similar action, but all appellate curative powers are of little avail unless the issues are developed properly before and during the trial phase.

More important in this instance than failure to pursue rights at the trial level is the failure to take advantage of recognized and prescribed procedure available to the accused after the violation had been specifically called to the attention of appellate defense counsel. Article 73 of the Code, 50 USC § 660, provides as follows:

> "At any time within one year after approval by the convening authority of a court-martial sentence which extends to death, dismissal, dishonorable or bad-conduct discharge, or confinement for one year or more, the accused may petition The Judge Advocate General for a new trial on grounds of newly discovered evidence or fraud on the court. If the accused's case is pending before the board of review or before the Court of Military Appeals, The Judge Advocate General shall refer the petition to the board or court, respectively, for action. Otherwise The Judge Advocate General shall act upon the petition."

The convening authority approved the finding and sentence on November 17, 1952, and, under the terms of the foregoing Article, accused had until November 17, 1953, in which to file a motion for a new trial. The transcript of the proceedings does not indicate the date it was first called to the attention of appellate defense counsel, but a supplemental assignment of errors specifically asserting that the conference prejudically affected the trial was signed by the defense counsel and served on the Government counsel on April 24, 1953. I shall assume that this was the date of discovery, and, based on that assumption, some seven months' time was available to raise the issue by motion for a new trial. I must charge defense counsel with knowledge of the provisions of Article 73 and, if so, they must have concluded to rely on the direct appeal rather than to raise the issue by motion for new trial. Moreover, Government counsel, in their brief, suggested that if a motion for new trial were to be considered The Judge Advocate General should be requested to make a full investigation. However, defense counsel preferred to rely on their supplemental assignment of error theory. Accordingly, I follow the doctrine that when there is a conscious selection of one avenue of approach to raise error and a rejection of the other, the principles governing the former control. In this instance the method of raising the error is not a matter of form, it is a matter of substance. If the accused were successful in raising the pretrial conference as a matter of prejudicial error on direct appeal, they might obtain a rehearing with a ceiling on the punishment, or a reduction in sentence by the board of review. If they proceeded by a motion for a new trial, the sentence would be undisturbed if the petition was denied. If it was granted on jurisdictional grounds and the accused were retried, they would not have the protection given by the Code prohibiting the increase of sentence. I can aptly illustrate what would happen in this instance were we to hold the claimed error divested the court-martial of jurisdiction. Two of the defendants who have served a goodly portion of their two-year sentence could be retried and sentenced to the maximum term of confinement. It would thus be trading a fixed and partially served sentence for a possible death sentence; and similar fate would face the other accused. From my review of the facts, it is entirely probable that I would work a grave injustice on all accused by holding that the proceedings were null and void.

I find no good reason for raising this error of law to the stature of a factor controlling jurisdiction. If I were to do so, I would distort a system to reach an error which could have been raised properly by a process available to the

78

accused. We have previously been required to dispose of cases in which there have been deprivations of statutory rights, and yet we have never gone so far as to base our action on a holding that the court-martial did not have jurisdiction to hear the cause. A reference to three cases will suffice. In United States v. Gordon, 1 USCMA 255, 2 CMR 161, we were confronted with an action in which the convening authority was disqualified from convening the court because he was an accuser. We expressly refused to base our grounds for reversal on jurisdiction and this is highlighted by Judge Brosman's concurring opinion in which he stated:

"I do not understand Judge Latimer to evaluate the error it contains as jurisdictional—whatever exactly this term may mean. I do understand him to have concluded that the substantial rights of the accused were materially prejudiced. I am sure he is correct in this determination."

In United States v. Littrice, 3 USCMA 487, 13 CMR 43, and United States v. Isbell, 3 USCMA 782, 14 CMR 200, we were considering the precise problem which now confronts us. While we may be oversimplifying the problem, in essence, it is: did the convening authority go beyond the purview of the Code and the Manual provisions which permit him to give general instructions to members of a court-martial? Discretion is involved and it is only when it is abused that error creeps in. In the Littrice case, supra, we reversed because we concluded the officer exceeded the bounds of authority granted to him. In that case we stated:

"The same delicate balance which beset Congress now confronts us. Justice can be dispensed and discipline maintained if one is not permitted to overwhelm the other. Both should be given recognition and both must be governed and guided by the necessities peculiar to the military service. The difficult test in this case is in determining whether the instructions given to the members of the court-martial unnecessarily impinged on the right of the accused to have his case heard by a court-martial unprompted by authority."

In the Isbell case, supra, the Court was divided as to whether or not there was error. Judge Brosman, who dissented, concluded there was error which prejudiced the accused, but certainly not one which ousted the court-martial of jurisdiction to try the case. Implicit in all opinions in the two cases is the realization that the balance between justice and discipline is delicate, and that many factors must be placed in both pans of the scale to determine the true balance. It would be an unworkable rule of law which would determine jurisdiction by each statement made by a convening authority which might top the balance for or against command influence.

One Circuit Court of Appeals case bears out my views. In Carter v. Woodring, 92 F2d 544 (CA DC Cir 1937), cert den 302 US 752, 82 L ed 582, 58 S Ct 283, the Court considered a somewhat similar contention. There the accused challenged the jurisdiction of the court because the officer who preferred the charges and certain members of the court-martial possessed a personal enmity toward him. The Court of Appeals said:

"The complaints contained in the appellant's bill when properly interpreted do not challenge the jurisdiction of the court-martial to sit in the case nor the validity of its sentence. It is true that appellant charges that false testimony was admitted and relied upon at the trial, that he was the victim of personal prejudice and malice held against him by those preferring the charges as well as some of the members of the court-martial. These matters, however relate to the proceedings before the court-martial and do not relate to the constitution of that body itself. The fact that prejudice may intervene or that perjury may be committed by witnesses or that mistakes may occur concerning the rules of procedure governing the case does not deprive the court, if otherwise qualified, of its jurisdiction to try a case."

From what has been said heretofore, it follows that the board of review erred in its determination that the error was jurisdictional. Accordingly, the third certified question is answered in the negative.

### III

Because of my holding that evidence of command control will not deprive the court-martial of jurisdiction to try the cause, the conclusion must necessarily be reached that the transcript cannot be used to fortify the record. However, because of the views of my associates the next question must be answered. The transcript with which we are here concerned was taken from a recording of the remarks made by the staff judge advocate at a conference held the day before the trial commenced. Present at the conference, in addition to the staff judge advocate, were the convening authority, the chief of staff, the law officer, a recording officer, and members of the court-martial. Trial and defense counsel were not present. The staff judge advocate described generally the duties of court-martial members as set out in the Code and the Manual, and included in his remarks a discussion of the offenses prevalent in the command. He explained that Camp Atterbury had a particular problem because it had the responsibility of processing all persons charged with desertion or absence without leave who were returned to military control in the State of Indiana. He then stated as follows:

"Now, this has acted to populate our stockade with dissident elements, with persons who have left their organizations and they have been the unhappy ones, some of the trouble-makers. It has overtaxed the confinement facilities of our stockade, as well as overtaxed the ability to handle of [sic] the people who work with the stockade. Corrective measures have been taken, the stockade has been enlarged, the personnel situation has been reorganized down at the stockade. However, this situation of a large number of people in the categories I have described has created a situation which is danger-ous within the stockade. It's a very touchy situation. In regard to discipline, these people are not responsive to discipline. We have had cases, for instance, some of them have been able to be disposed of by the administrative segregation in the stockade. Some of them we have had to try by courts-martial. More cases like that are in the offing. In anything involving this sort of case, it is necessary (1) that the case be handled promptly, expeditiously and that we act firmly. Otherwise, we aggravate the situation within the stockade. Failure to act in this manner can only result in the compounding of the problem and a reasonable likelihood that further outbreaks or disturbance will occur within the stockade. There is no situation that can more adversely affect the command than trouble in the stockade, and lead to adverse publicity to the Army in civilian newspapers and otherwise."

We have previously had occasion to examine the provisions of the Code and the Manual dealing with command control. In United States v. Littrice, supra, we discussed the arguments advanced both for and against a restriction of the commanding officer's participation in courts-martial at the time the Code was under consideration by the Congress. What we determined to be the conclusion of Congress when it enacted the Code is set forth in the Littrice case, supra, as follows:

"Thus, confronted with the necessity of maintaining a delicate balance between justice and discipline, Congress liberalized the military judicial system but also permitted commanding officers to retain many of the powers held by them under prior laws. While it struck a compromise, Congress expressed an intent to free courts-martial members from any improper and undue influence by commanders which might affect an honest and conscientious consideration of the guilt or innocence of an accused. Both the Code and the Manual announce the same caveat. Article 37 of the Code, 50 USC § 612, states it in the following language:

'No authority convening a general, special, or summary court-martial, nor any other commanding officer, shall censure, reprimand, or admonish such court or any member, law officer, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this code shall attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.' "

The above-quoted Code provision placed restrictions upon the activities of the commanding officer. However, reserved to him was a sphere in which he was allowed powers essential to the maintenance of military discipline within his command. The Manual permits him to give certain instructions to them, and they "may include information as to the state of discipline in the command, as to the prevalence of offenses which have impaired efficiency and discipline, and of command measures which have been taken to prevent offenses." (Paragraph 38, Manual for Courts-Martial, supra.)

As noted in Littrice, supra, the problem of maintaining a balance between military discipline and military justice, which once confronted the Congress, is now before us in cases where an undue exercise of command influence is asserted. In this instance, I believe the scales weigh heavily against the commanding officer. Merely because he was dealing with problems peculiar to a camp stockade does not insulate him from the limitations imposed by the Code. Undoubtedly, much of the information imparted to the court-martial members was helpful and within the scope of his authorization. However, the reference to "dissident elements" within the stockade, "troublemakers," and "people who are not responsive to discipline" indicate an attempt to create bias against these

particular accused. When viewed in the light of the fact that these accused were occupants of the stockade at the time the offenses occurred; that they were to be tried for mutiny against the officials whose duty it was to enforce discipline within the stockade; and that their trial was to be heard by the court-martial the following day, the prejudice resulting from the staff judge advocate's language is detectable. Moreover, the court-martial members were told that "more cases like this are in the offing"; that it was essential "that the case be handled promptly, expeditiously"; that they "act firmly," otherwise the situation in the stockade would be aggravated; that that would "only result in the compounding of the problem and a reasonable likelihood that further outbreaks or disturbances will occur within the stockade"; and, that "there is no situation that can more adversely affect the command than trouble in the stockade, and lead to adverse publicity to the Army in civilian newspapers and otherwise."

Other statements diluting the effect of those quoted were made but I need not attempt to strike a balance. At the very least, a reasonable interpretation of the instructions given is that the court-martial members were to impose heavy sentences on these particular offenders in order to deter other inmates from committing similar offenses or affronts to discipline. That is one of the vices Congress sought to eliminate, and its presence in this case is borne out by the extreme sentences imposed. That members of the military judicial system in the Army appreciated the accused had been prejudiced is apparent from the decision of the board of review and the act of The Judge Advocate General in cutting the sentences to the extent he did. If any such error can be cured by reviewing authorities, he made a reasonable effort to correct it.

I agree with the board of review in that portion of its decision which covers this issue. Accordingly, in answer to the second certified question I hold that the remarks of the staff judge advocate at the pretrial conference contravened

the provisions of the Code and the Manual.

## IV

The fourth certified question seeks a determination of what action, if any, the board of review could have taken to correct the prejudicial effect of the error. I do not answer that question completely for the reason that the board of review members decided the case on jurisdictional grounds and I do not know to what extent they may have considered the record for the presence of other possible infirmities. A reversal for any prejudicial error found in the record would correct the error. Furthermore, assuming there are no other deficiencies, the board of review did not determine the appropriateness of the sentence.

I would, therefore, reverse the decision of the board of review and reinstate the findings as returned by the court-martial and affirmed by the convening authority. However, as previously indicated, I stand alone on this disposal; and by virtue of the holdings of the majority of the Court, the decision of the board of review is modified by granting a rehearing, and, as modified, is affirmed.

The record is returned to The Judge Advocate General and a rehearing is ordered.

QUINN, Chief Judge:

Although I agree that the exercise of command control will not deprive the court-martial of jurisdiction to try an accused, I believe that on a proper showing, a board of review has the power to ascertain the existence of such control, even though no suggestion of it appears in the record of trial itself. The rule that an appellate tribunal will not consider questions not raised in the trial forum is only a rule of expediency. In speaking of this general rule, the Supreme Court of the State of Wisconsin said:

". . . One of the rules of wellnigh universal application established by courts in the administration of the law is that questions not raised and properly presented for review in the trial court will not be reviewed on appeal. . . . The reason for the rule is plain. If the question had been raised below, the situation might have been met by the opposite party by way of amendment or of additional proof. In such circumstances, therefore, for the appellate court to take up and decide on an incomplete record questions raised before it for the first time would, in many instances at least, result in a great injustice, and for that reason appellate courts ordinarily decline to review questions raised for the first time in the appellate court. But to this rule there are many exceptions. . . . No question of the power of this court is involved. Whether this court should review a question raised here for the first time depends upon the facts and circumstances disclosed by the particular record. It undoubtedly has the power, but ordinarily will not exercise it. The question is one of administration, not of power." [Cappon v. O'Day, 162 NW 655, 657, 165 Wis 486, 1 ALR 1657.]

One of the well-recognized exceptions to the general rule is that "questions of a general public nature affecting the interest of the state at large may be determined by the appellate court without having been raised in the trial court." 4 CJS, Appeal and Error, Section 242. Certainly a question of command control may properly be considered as one which gravely affects the military community. Moreover, the reason for the rule referred to in Cappon v. O'Day, supra, is not present in this case. The correctness of the transcript of the pretrial proceedings is uncontested and for the purposes of this case is unalterable. Consequently, had the issue of command control been raised at the trial level, the Government could not have presented any evidence other than that contained in the transcript itself. When the reason for a rule is absent, we should not blindly adhere to a useless formalism. I would set aside the findings of guilty and order a rehearing.

BROSMAN, Judge:

Four questions relating to this case were certified by the Acting The Judge

Advocate General, United States Army, which are set out below:

"(1) As a matter of law did the board of review have the right to consider the transcript of the conference held on 25 September 1952 in reaching its decision?

"(2) If the answer to (1) is in the affirmative, did the remarks of the Staff Judge Advocate at this conference contravene any provision of law?

"(3) If the answers to (1) and (2) are in the affirmative, was the error jurisdictional, rendering the findings and sentence null and void?

"(4) Assuming *arguendo* that error was committed, could not the board of review have cured any possible prejudice to the substantial rights of accused by appropriate reduction of the sentences as has been done by The Judge Advocate General?"

The author of the principal opinion has sought to respond to the first three inquiries, but—as I understand the question's meaning—did not furnish a complete answer to the fourth. I concur without reservation in his conclusions with respect to the second and third certified questions—that is, I agree that "command control" was indeed present here, and that the error was not jurisdictional—as we understand the term. Moreover, I am quite willing to express an unqualified opinion on the Army's final inquiry. As I see it, no "appropriate reduction ▮ in sentences" can ever purge the vice of a demonstrated attempt to exercise undue command influence. This error—if it exists in a particular case—distinctly affects the findings as well as the sentence, and renders them in the fullest sense dubious. The compelling evidence rule can have no possible play in this area, nor can the sort of thinking expressed by the majority—of which I was a member—in United States v. Gibson, 3 USCMA 512, 13 CMR 68. The necessity for this position is so clearly evident that no sort of elaboration of it will be attempted.

However, I find myself in utter disagreement with Judge Latimer in his position on the Service's first question —that is to say, I part company with him when he concludes that the board of review was without power to consider the transcript of the pretrial conference save on the question of jurisdiction. And, of course, once I acknowledge that there was authority to consider the transcript, I am required to decide that the findings must fall. United States v. Littrice, 3 USCMA 487, 13 CMR 43. However, since the error was nonjurisdictional, I would order a rehearing, rather than "another trial," as the board of review did.

If I take his meaning, the Chief Judge and I are quite in agreement on this last matter—that is, as to the proper dispository action. However, he appears to rest the board's power to consider the transcript on the notion that "command control," of the sort visible here, presents a question "of a general public nature." Therefore, according to him, an instance of its occurrence is reviewable in the interests of justice— regardless of whether it was made a part of the record of trial. Without necessarily rejecting the core of Judge Quinn's approach, I suggest the following—and perhaps more specific—lines to our common result.

II

Initially I observe that Judge Latimer appears to accept the validity of Rule IXF of the Uniform ▮ Rules of Procedure for Proceedings In and Before Boards of Review, by which these agencies are granted authority to consider matters outside the record of trial for certain purposes. One such purpose is "jurisdiction." My colleague tests this term by the definition applicable to civil court review of court-martial judgments—in short by that which would be used in habeas corpus proceedings. I doubt that, as used in Rule IXF, the word should be construed in this narrow fashion. In this connection, it should be noted that past board of review decisions have, with respect to appellate military review, expressed an extremely—even an objectionably—broad con-

ception of what constitutes "jurisdictional" error. Cf. United States v. Hutchison, 1 USCMA 291, 3 CMR 25; United States v. Goodson, 1 USCMA 298, 3 CMR 32; United States v. Pulliam, 3 USCMA 95, 11 CMR 95 (all three cases reversing such decisions); United States v. Fulwider, 4 BR–JC 303; United States v. Watson, 4 BR–JC 157; United States v. Ness, 6 BR–JC 345; United States v. Taylor, 4 BR–JC 235; CMO 3–1944, page 468; CMO 9–1946, page 319; CMO 1–1941, page 171.

I am inclined to believe, therefore, that, under the approach found in this line of decisions, the sort of error with which we are now concerned could with much justification have been considered "jurisdictional." Since the Rules of Procedure were promulgated prior to the elaboration by this Court of a decisional framework concerning jurisdiction, I suspect that their terms should be construed in light of the views prevalent at the time they were confected. If this view is to be taken, then the board may well have been correct in its conclusion that a problem of jurisdiction confronted its members within the meaning of its own Rules—although not at all in the sense used by Federal courts in habeas corpus cases, and certainly not in the sense used by this Court.

III

In any event, under Rule IXF, "When

requested by the Judge Advocate General, a board of review may hear and report to him on, any matter outside the record in mitigation of the sentence, or otherwise in the interest of justice." I suspect that this provision must be interpreted to operate in a single direction only, that is, only in favor of an accused person—for I very much doubt that new matter could properly be introduced on review to harm him either as to findings or sentence. Accordingly, his appellate counsel's objection would effectively block the weighing of any such matter not found in the original record of trial.

It seems undisputed that in the present case the transcript of the pretrial conference was forwarded to The Judge Advocate General at his own request. Thereafter, I would infer that he transmitted it to the board through regular administrative channels[1]—and prior to the argument of the case at that level. It is true that The Judge Advocate General did not expressly say to the board's members: "I desire that you consider this document and report to me thereon." However, it is equally clear that he was not presenting them with the transcript because of its entertainment value. Did he not mean for them to utilize it in connection with the present case—and with literally no limitations on their use of it? Appellate defense counsel—far from objecting to the board's consideration of the paper—made it the basis for a supplemental as-

<hr>

[1] The board of review decision initially recites that "there was received, pursuant to the request of The Judge Advocate General of the Army, and passed to this board through regular administrative channels," a transcript of the instant pretrial conference. Elsewhere in the opinion it is stated that, on receipt of the transcript by The Judge Advocate General, "this matter was referred through administrative channels to the appellate defense counsel for such use as he might desire to make of it." It has been suggested that the second remark qualifies the first, and signifies that the appellate defense counsel was part of the "administrative channels" through which the transcript reached the board. I would consider this an unusual conception of the term "administrative channels," and

would resolve any possible inconsistency through the assumption that The Judge Advocate General brought the transcript of the pretrial conference to the attention of both the board of review and the defense counsel for such use as each might choose to make of it. The appellate defense brief in this Court states only that the transcript was received pursuant to the request of The Judge Advocate General and "passed to the Board of Review through regular administrative channels." Thus, this brief certainly does not contradict my interpretation of the events at the board's level. The Government brief in this Court simply incorporates by reference the board of review's statement of facts—and so sheds no light on this matter. Other papers in the file before us likewise add nothing.

signment of error. Under those circumstances, and within the framework of Rule IXF, it would seem to me that the board was as free to consider the transcript as if it had constituted a part of the record.

## IV

The Rules of Procedure also authorize a board of review to hear matter outside the record of trial in connection with its consideration of a petition for new trial—and without this power its members could not perform competently the role assigned them by Congress in Article 73 of the Code. Judge Latimer suggests that the present accused should have filed petitions for new trial if they desired review of the pretrial conference. This alternative will offer little solace to their lawyers, of course, since it would seem that they are now barred by the one year limitation placed on petitions for new trial by Article 73. In short, my associate would say that they should be told by this Court that, for their want of pleading in a certain style, the accused are now precluded from obtaining redress for an error which is highly prejudicial, and which transgresses a specific and fundamental mandate of Congress—one of overwhelming, even paramount, importance in the scheme of military justice.

In this setting, and at this point in the proceedings, I would be quite willing to say—if necessary, ▋ and if the defense are so minded—that the supplemental assignment of error, filed by them with the board of review seven months before expiration of the time limitation prescribed by Article 73, should be treated as a petition for new trial, at least to the extent of tolling the running of that period of limitation. Clearly there is ample general precedent for the construction of a pleading in such a manner as to accomplish the relief for which it prays, when this is done in the manifest interests of justice. United States v. Morgan, 346 US 502, 98 L ed 248, 74 S Ct 247; Darr v. Burford, 339 US 200, 94 L ed 761, 70 S Ct 587; Crowe v. United States, 169 F2d 1022, 175 F2d 799 (CA 4th Cir). This Court has certainly not hesitated heretofore to follow a markedly liberal course with respect to technical defects in pleadings. United States v. Jackson, 2 USCMA 179, 7 CMR 55; United States v. Marshall, 4 USCMA 607, 16 CMR 181. Cf. United States v. Walters, 4 USCMA 617, 16 CMR 191.

To permit the accused to effect the suggested election would not prejudice the Government in any manner. The pretrial conference transcript went initially to The Judge Advocate General, and thus followed the requirement for routing a petition for new trial. Thereafter, it was acted on by the board of review, before which the case was pending at the time the document was submitted to The Judge Advocate General—just as a petition for new trial would have been acted on by the same body under like conditions. To be sure, the present transcript was not supported by affidavits of the accused, as is required of such a petition. However, since it came from the Government, and was of indisputable accuracy and credit, the offer of defense affidavits would have been superfluous indeed. The showing required in petitions for new trial that the accused was not remiss in failing earlier to obtain the information presented in the petition is implicit—at least prima facie—in the Government's transcript and the surrounding circumstances. Indeed, the document clearly reveals that neither trial counsel, defense counsel, nor the accused was present at the preliminary meeting at which the convening authority "instructed" the members of the court.

It has been suggested that the accused made a conscious choice against the submission of a petition for new trial to the board of review and elected to rely either on obtaining a rehearing, or on upsetting the jurisdiction of the court-martial—with the result that the entire proceeding would be treated as a nullity. While the supplemental defense assignment of error does request a rehearing, it is to be noted that a list of authorities supporting this pleading assails the *jurisdiction* of the court-martial which convicted the accused.

I am unable to see how the accused

could have received any sort of advantage through having the proceeding declared void for want of jurisdiction, instead of seeking and receiving a new trial under Article 73. On obtaining a new trial under the terms of this Article, the permissible punishment would have been limited to that assessed following the first hearing. On the other hand, it appears that no limitation on the punishment imposable at "another trial" may accrue from a proceeding in which the court-martial lacked jurisdiction. Therefore, I find difficulty in understanding why the accused consciously chose the latter route. I can only attribute the failure to file a petition for new trial to a mistaken belief on the part of the defense that, under existing law, the error was so clearly jurisdictional that—however raised procedurally—the board of review would hold the court-martial's findings to be null and void. There is, in short, no sly speculation of a nature to induce me to say that appellate defense counsel had gambled in determining not to submit a petition for new trial when they might have done so, and therefore that we should not now correct that lost risk through permitting their supplemental assignment of error to be treated as a petition for new trial.

### V

In connection with the instant case it is not amiss to recall that in United States v. Walters, supra, this Court concluded that a recess conference constituted an integral part of the court-martial's "proceedings," although not contemporaneously reported in the record. We considered there that Congress had intended the events of that meeting to be regarded as a part of the record of trial—and to be reviewed by us and by the board of review. Under the peculiar circumstances of the present case I feel sure that—functionally speaking—the events of the pretrial conference constituted distinct parts of the "business" transacted by the court-martial which tried the accused before us. Here on the very day before the trial the members of the court-martial, together with the law officer, were assembled for briefing. The occasion's principal speaker was the chief legal adviser to the Commanding General, who referred the case for trial and appointed the court-martial—and who himself was present. The formality of the occasion is attested by the preparation of a verbatim transcript of the instructional lecture provided by the staff judge advocate. When I consider the conference realistically and within its proper context, I find the line separating it from the formal convening of the court and the swearing of court members and counsel to be imperceptible indeed. Under such circumstances I would incline to say that the board of review did not at all lack power to weigh these events—for they *were* "proceedings" within the meaning of Article 39 of the Code.

### VI

With respect to Federal civilian courts it is expressly provided that one who is in custody "under sentence of a court established by Act of Congress" is entitled to release if "the sentence was imposed in violation of the Constitution or laws of the United States." 28 USC § 2255. This procedure was created to supersede to some degree in the Federal sphere the writ of error coram nobis. That writ, however, in part yet survives. United States v. Morgan, supra. It is also used frequently by state courts in connection with the review of claims of violation of due process. Hysler v. Florida, 315 US 411, 86 L ed 932, 62 S Ct 688; Taylor v. Alabama, 335 US 252, 92 L ed 1935, 68 S Ct 1415; Brown v. Allen, 344 US 443, 97 L ed 469, 73 S Ct 397. Events which do not appear in the record, but which involve significant rights, are the usual subjects of the writ of error coram nobis.

The Supreme Court has rested the use of coram nobis on the All Writs Act, 28 USC § 1651 (a). Whether this Act has application to this Court, or to the several boards of review, I need not now resolve—although I incline to the belief that this Court, at least, falls within its broad sweep. Be that as it may, I am convinced that, by the very

fact that they and we are appellate tribunals within a judicial system, both boards of review and this Court possess authority to correct a fundamental error which corrupts an entire proceeding and challenges its integrity. An undisputed and flagrant instance of command control—like that at bar—would certainly amount to such a fundamental error.

It might also be observed that the provision of such a remedy for service personnel conforms to basic Congressional intent to the effect that a military accused person shall be granted, wherever possible, rights anologous to those enjoyed by the civilian criminal defendant. Since the protection of 28 USC § 2255 does not, in terms, seem applicable to military law administration, I believe that the basic scheme erected by Congress, together with the recent Supreme Court decision in the Morgan case, supra, suggest that the writ of error coram nobis must be held usable here.[2] Certainly it offers a powerful analogy.

## VII

I have recorded in detail my dissent from Judge Latimer's concession of judicial impotence, and have suggested several theories on the basis of which an opposite conclusion could have been reached. In a separate opinion in United States v. Navarre, 5 USCMA 32, 17 CMR 32, I spoke as follows:

". . . We are here engaged in no game in which defense counsel is the player and the accused a pawn. Instead, we are dealing with a problem of such overwhelming importance

in the scheme of military justice that it may be said to lie at the very core of the Code. It is my profound conviction indeed that, in the absence of this problem, literally there would have been no Uniform Code of Military Justice and no Court of Military Appeals. Does it not follow then that, save in the clearest cases, we must not permit ourselves to be insulated from its consideration?"

This language—with its necessary implications—just about sums up my attitude toward the vice of so-called "command control," and in turn my determination to exercise control over *it*. It has been suggested informally that this Court is one of substantial justice and not of law. I have no means of knowing whether the comment was intended as a compliment or the reverse. For myself, however, I have never believed that there exists a necessary dichotomy between law and justice—measured in its broadest aspect. And if there does, then in my book so much the worse for the law. And if administering law requires that I think after the manner of the eighteenth century, then I am clearly administering something else. No longer, I believe, may a misplaced comma mean on occasion the loss of a man's life or his fortune. Here I am sure that I am administering justice and at the same time law—a solemn expression of legislative will. Certainly the Congress did not mean to inveigh against undue command influence—as it did—and then leave this Court powerless to do anything about it.

I am convinced that the board of re-

---

[2] Two observations seem appropriate at this point. In the first place, I believe that the common law civilian precedents indicate that, after a case has coursed through the hierarchy of judicial review, a writ of error coram nobis must be addressed to the highest appellate tribunal. See Garrison v. United States, 154 F2d 106 (CA5th Cir); Flowers v. United States, 86 F2d 79 (CA8th Cir); Strang v. United States, 53 F2d 820 (CA5th Cir); Hysler v. Florida, supra; Taylor v. Alabama, supra; Brown v. Allen, supra. Sec-

ondly, I would believe that in military law, unlike its civilian counterpart, the basis for the writ must be deemed to expire on the termination of the confinement of the accused. I ground this conclusion on the circumstance that adequate redress of disabilities persisting beyond the termination of confinement has been granted by the Congressional provision for the establishment of Boards for the Correction of Military Records. 5 USC §§ 191a, 275. This legislation has, I believe, preempted the field of relief once an accused's status as a prisoner has ended.

view here could have considered the transcript of the pretrial instructional conference— and quite apart from any question of jurisdiction, however narrowly or broadly we may interpret the term. Once that transcript is considered, the direction of a rehearing is compelled.